# United States Court of Appeals
## For the First Circuit

No. 16-1228

CATHY N. BATES, a/k/a Lynn Cathy Bates, a/k/a Cathy Lynn
Nichols; and TIMOTHY J. BATES,

Appellants,

v.

CITIMORTGAGE, INC., s/b/m to ABN AMRO Mortgage Group, Inc.;
and FEDERAL HOME LOAN MORTGAGE CORPORATION,

Appellees,

VICTOR W. DAHAR,

Trustee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Steven J. McAuliffe, U.S. District Judge]

Before

Lynch, Thompson, and Barron,
Circuit Judges.

Terrie Harman, Kristina Cerniauskaite, and Harman Law
Offices, on brief for Appellants.
Gregory N. Blase, David D. Christensen, and K&L Gates LLP, on
brief for Appellees.

December 14, 2016

THOMPSON, **Circuit Judge**. Cathy N. Bates and Timothy J. Bates (our Appellants, whom we also call the Bateses) went bankrupt and Appellees foreclosed on their home. At the end of the tax year, they each received an IRS Form 1099-A in the mail alerting them that the foreclosure might have tax consequences. The Bateses sued our Appellees, claiming that the Forms were a coercive attempt to collect on the mortgage debt--a debt Appellees have no right to collect because it was discharged during the Bateses' Chapter 7 proceedings. The bankruptcy court and the district court found the Forms were not objectively coercive attempts to collect a debt. We agree, and so we affirm.

## The Facts

The Bateses took out a loan from Appellee CitiMortgage, Inc. s/b/m to ABN AMRO Mortgage Group, Inc. ("CitiMortgage") secured by a mortgage on their home in Newport, New Hampshire. The Bateses filed for Chapter 7 bankruptcy in 2008 and their mortgage debt was discharged in 2009. The Bateses entered into a Loan Modification Agreement with CitiMortgage after the discharge. Under that Agreement, the Bateses did not reaffirm personal liability for the mortgage, but they could avoid foreclosure and stay in their home as long as they continued to make payments to CitiMortgage. The Bateses eventually stopped making payments, CitiMortgage foreclosed, and the Bateses moved out in October 2011.

In January 2012, the Bateses each received an IRS Form 1099-A ("1099-A Form" or "Form") in the mail. According to the instructions on the back of the Forms, "[c]ertain lenders who acquire an interest in property that was security for a loan . . . must provide you with this statement. You may have reportable income or loss because of such acquisition or abandonment." Both Forms listed the lender as "Freddie Mac" (also known as Federal Home Loan Mortgage Corporation, our other Appellee) "c/o CitiMortgage." And, as of the time of acquisition, the Forms listed the "balance of principal outstanding" as $194,624 and the fair market value of the property as $168,000. Box Five on the Forms was checked, indicating that "the borrower was personally liable for the repayment of the debt." The front of the Forms also says "This is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if taxable income results from this transaction and the IRS determines that it has not been reported."

We pause here to note that a discharged debt can count as taxable income. 26 U.S.C. § 61(a)(12). But, as Appellees point out (and the Bateses do not dispute), debt discharged in bankruptcy proceedings (like the Bateses') and on a qualified principal residence (like the Bateses') does not. 26 U.S.C. § 108(a)(1)(A), (E). The Bateses' 1099-A Forms directed them to "Pub. 4681 for

- 3 -

information about foreclosures and abandonments." That publication explains: "Debt canceled in a title 11 bankruptcy case is not included in your income." I.R.S., Dep't of the Treasury, Publication 4681: Canceled Debts, Foreclosures, Repossessions, and Abandonments (for Individuals) 4 (2011), https://www.irs.gov/pub/irs-prior/p4681--2011.pdf. The Bateses do not claim that they owed any taxes as a result of the foreclosure or the Forms.

But, the Bateses say the 1099-A Forms reported bad information. After their bankruptcy, the Bateses were no longer personally liable for the mortgage debt, so they say Freddie Mac should not have checked the box showing the opposite.[1] Timothy Bates averred that he called Appellees about his Form and was told that the debt was not discharged because it was a secured debt. The Bateses' attorney later sent a letter to Freddie Mac pointing out that the Bateses' mortgage was discharged in bankruptcy and demanding the revocation of the 1099-A Forms. The Bateses say they were terrified they would owe additional income taxes unless they

---

[1] The Bateses also claim that the fair market value of their home was the price Freddie Mac paid at the foreclosure sale, $205,237, so Freddie Mac should not have reported the fair market value as $168,000 on the 1099-A Forms. Appellees dispute the fair market value of the home. Whatever the home's value, the Bateses did not make this argument or present any evidence of this fact to the bankruptcy court, so the argument is waived. Crefisa Inc. v. Wash. Mut. Bank (In re Colonial Mortg. Bankers Corp.), 186 F.3d 46, 49-50 (1st Cir. 1999).

- 4 -

resolved the matter with Freddie Mac or CitiMortgage. Freddie Mac did not revoke the Forms and claims they are accurate.

One other important detail: the Bateses received a pre-recorded phone call from CitiMortgage on June 11, 2013, requesting proof of insurance on their old home; insurance was required under the terms of their former mortgage agreement. The phone call upset Timothy Bates: "it seemed we would never be free from the debt to CitiMortgage."

In May 2013, about one month before receiving the last-straw phone call from CitiMortgage, the Bateses filed a motion to reopen their bankruptcy proceedings, then sued CitiMortgage and Freddie Mac for attempting to collect on the discharged mortgage debt in violation of the discharge injunction provisions of 11 U.S.C. § 524(a). Following cross-motions for summary judgment, the bankruptcy court granted the Bateses summary judgment on their claim that the 2013 phone call violated the discharge injunction, though it later found the Bateses did not prove any damages on this claim. The bankruptcy court granted summary judgment for our Appellees on all of the Bateses' other claims, including their claim that the 1099-A Forms violated the discharge injunction. The bankruptcy court found the Forms gave the Bateses "no objective basis" to believe Appellees were trying to collect the discharged mortgage debt. The Bateses appealed the bankruptcy court's rulings on damages and the 1099-A Forms. The district court affirmed both.

The Bateses now appeal the bankruptcy court's ruling on the 1099-A Forms to us.

## Standard of Review

Under Federal Rule of Bankruptcy Procedure 7056, as under Federal Rule of Civil Procedure 56, a motion for summary judgment "should be granted 'only when no genuine issue of material fact exists and the movant has successfully demonstrated an entitlement to judgment as a matter of law.'" Hannon v. ABCD Holdings, LLC (In re Hannon), 839 F.3d 63, 69 (1st Cir. 2016) (quoting Desmond v. Varrasso (In re Varasso), 37 F.3d 760, 763 (1st Cir. 1994)). We review the bankruptcy court's summary judgment decision de novo and give no special deference to the district court's findings. Id.

## The Bateses' Claim

The Bateses allege that the 1099-A Forms violated the discharge injunction provisions of 11 U.S.C. § 524(a), which prohibit acts to collect, recover, or offset debts discharged in bankruptcy proceedings. See Canning v. Beneficial Me., Inc. (In re Canning), 706 F.3d 64, 69 (1st Cir. 2013). To prove a discharge injunction violation, a debtor must establish that the creditor "(1) has notice of the debtor's discharge . . . ; (2) intends the actions which constituted the violation; and (3) acts in a way that improperly coerces or harasses the debtor." Best v. Nationstar

- 6 -

Mortgage LLC, 540 B.R. 1, 9 (B.A.P. 1st Cir. 2015) (quoting Lumb v. Cimenian (In re Lumb), 401 B.R. 1, 6 (B.A.P. 1st Cir. 2009)).

The Bateses and our Appellees only dispute the third element--whether the 1099-A Forms were an improperly coercive or harassing attempt to collect on the discharged debt. The Bateses claim the Forms were coercive, especially because the Forms contained false information. They also claim the bankruptcy court erred by failing to consider whether the Forms were coercive under all the circumstances, including Freddie Mac's failure to correct the Forms and the phone call from CitiMortgage about the insurance policy on their old home. CitiMortgage and Freddie Mac, of course, disagree. So do we. We explain.

We assess whether conduct is improperly coercive or harassing under an objective standard--the debtor's subjective feeling of coercion or harassment is not enough. In re Lumb, 401 B.R. at 6; see Pratt v. Gen. Motors Acceptance Corp. (In re Pratt), 462 F.3d 14, 19 (1st Cir. 2006). We have no "specific test" to determine whether a creditor's conduct meets this objective standard, but we consider the facts and circumstances of each case, including factors such as the "immediateness of any threatened action and the context in which a statement is made." Diamond v. Premier Capital, Inc. (In re Diamond), 346 F.3d 224, 227 (1st Cir. 2003); see In re Pratt, 462 F.3d at 20. "[A] creditor violates the discharge injunction only if it acts to collect or enforce a

prepetition debt; bad acts that do not have a coercive effect on the debtor do not violate the discharge." In re Lumb, 401 B.R. at 7.

For example, a debt collector in Best, 540 B.R. at 10-11, sent a series of letters stating information like the unpaid loan balance and that failure to pay could result in foreclosure; the letters included a disclaimer explaining that if the debt had been discharged in bankruptcy, then the letter was for informational purposes only. These letters did not violate the discharge injunction because "[s]tatements of an informational nature, even if they include a payoff amount, are not generally actionable if they do not demand payment," and these letters did not. Id. at 11. Likewise, references to potential foreclosure in letters to a debtor during bankruptcy proceedings were not coercive where the letters accurately reported that the debtor could face foreclosure after bankruptcy but threatened no "immediate action" against the debtors. Jamo v. Katahdin Fed. Credit Union (In re Jamo), 283 F.3d 392, 402 (1st Cir. 2002) (quoting Brown v. Penn. State Emps. Credit Union, 851 F.2d 81, 86 (3d Cir. 1988)).

The bankruptcy court found, and we agree, that the 1099-A Forms are not a collection attempt. The 1099-A Forms state that they provide "tax information" and that, because of the foreclosure, "[y]ou may have reportable income or loss." As in Jamo and Best, the Forms provide "information," but they do not

demand payment or threaten any action. As in Jamo and Best, the 1099-A Forms state the outstanding principal balance as of the date of foreclosure, but they do not indicate that the Bateses owe any money to anyone--not taxes to the IRS, and not the discharged debt to Freddie Mac or CitiMortgage. And that Freddie Mac may have incorrectly checked the box showing that "the borrower was personally liable for repayment of the debt" does not change this analysis: nothing on the Forms indicates that the Bateses' potential "reportable income or loss" might be any different because of the checked box, and checking the box does not change the informational nature of the Forms or create a demand for payment. Because the discharge injunction prohibits acts "to collect, recover or offset" discharged debt, 11 U.S.C. § 524(a)(2), the fact that the 1099-A Forms do not attempt to collect any money from the Bateses would seem to decide the issue.

Undeterred, the Bateses claim the bankruptcy court was wrong because the Forms put the Bateses "between a rock and a hard place": they had to pay the discharged debt or seek tax advice. This tight spot makes the Forms coercive, they say, just as a tight spot made a creditor's conduct coercive in In re Lumb, 401 B.R. at 7. But the Bateses' situation does not compare.

The In re Lumb creditor threatened to sue the debtor's wife to collect if the debtor did not pay up. Id. at 3. When the debt was discharged in bankruptcy, the creditor followed through

on the threat, and the couple incurred $50,000 in legal fees defending the meritless lawsuit. Id. at 5, 8. So, the debtor was in a jam:  pay the discharged debt, or pay the legal fees and risk losing the lawsuit. Id. at 8-9. In re Lumb features all of the hallmarks of objectively coercive creditor collection actions, and then some: an illicit demand to pay a debt despite the automatic stay (and later, the discharge injunction); a threat of immediate action if the debtor did not comply; and follow-through on that threat.

The Bateses have nothing in common with the debtor in In re Lumb. The Bateses were confronted with no demand for payment and the Forms threatened no action. Nor was any action taken by Freddie Mac illicit, as the parties agree that Freddie Mac was required to file the 1099-A Forms as a result of the foreclosure. So unlike in In re Lumb, where the consequence of paying to defend a bogus lawsuit was brought on by the creditor's misdeeds, here the consequence of potentially needing tax advice was triggered by the foreclosure itself. That some consequence may have followed from the Bateses' receipt of the 1099-A Forms does not make that consequence coercion.[2]

---

[2] The Bateses also make two arguments here related to the fair market value of their property. First, they say they would have had no tax questions at all if the Forms were filled out correctly and "no deficiency or liability [was] displayed." They also argue that if they reported what they believed to be the true fair market value on their taxes, the discrepancy between their figure and the

Finally, the Bateses claim the bankruptcy court erred because it did not consider all of the circumstances surrounding the 1099-A Forms. Freddie Mac did not correct the Forms after Timothy Bates called about his Form and after the Bateses' attorney sent a letter demanding the Forms be revoked. They also claim the bankruptcy court should have included the May 2013 pre-recorded phone message in the coercion calculus. These arguments do not help the Bateses.

As to the failure to correct the 1099-A Forms, the Bateses' argue their situation is like that of a debtor faced with a false credit report, and a creditor's refusal to correct a false credit report can show the creditor was trying to coerce the debtor into paying a debt, so that inference should apply here, too. It does not. Reporting false or outdated information to a credit agency in an attempt to coerce payment on a discharged debt can

---

1099-A Forms could trigger an audit. As stated above, the Bateses' argument about the fair market value of their home is waived because it was not presented to the bankruptcy court, and so these derivative arguments are waived, too. In any case, the Bateses cite a Tax Topic to bolster their claim that a discrepancy between a tax return and a 1099-A Form can trigger an audit, but that same Tax Topic refers back to Publication 4681, which says debt cancelled in bankruptcy is not included in income. Indeed, the Bateses do not argue or present evidence that they had any tax liability, reported this event on their taxes, sought tax advice, or took any other action because of the Forms. See I.R.S., Tax Topic 432: Form 1099-A (Acquisition or Abandonment of Secured Property) and Form 1099-C (Cancellation of Debt), https://www.irs.gov/taxtopics/tc432.html (last updated Oct. 10, 2016); Publication 4681, supra, at 4.

violate the discharge injunction. See In re Zine, 521 B.R. 31, 40 (Bankr. D. Mass. 2014); Torres v. Chase Bank USA, N.A. (In re Torres), 367 B.R. 478, 486 (Bankr. S.D.N.Y. 2007) (collecting cases). The reason:  negative credit reports have consequences-- like reducing creditworthiness, and with it the debtor's ability to get loans in the future--and so a false report might coerce a debtor into paying a discharged debt to avoid those consequences. In re Torres, 367 B.R. at 486. Evidence that a creditor refused to change a false or outdated report can give rise to an inference that the creditor intended to coerce the debtor into paying the discharged debt. Id. at 489-90.

The Bateses' situation is not analogous. As we explained above, even if Freddie Mac incorrectly checked the box showing the Bateses were personally liable for the debt, filing the 1099-A Forms did not create tax liability for the Bateses or any other consequences beyond those that come with foreclosure. Because there were no consequences and no attempt to collect a debt, Freddie Mac's failure to retract the 1099-A Forms does not give rise to an inference of coercion.

As to the pre-recorded message, the call was made by CitiMortgage around a year and a half after the Bateses received their 1099-A Forms. As the bankruptcy court noted, there is no other evidence in the record of communication between the Bateses and Freddie Mac or CitiMortgage about the discharged debt after

- 12 -

the foreclosure.[3] The Bateses do not say why this phone call makes the Forms objectively coercive, and we see no reason to believe that it does.

## Conclusion

We do not doubt that the 1099-A Forms caused the Bateses stress and concern. Indeed, when Timothy Bates called about the Forms, CitiMortgage just made things worse: its representative gave him wrong information and told him that the debt had not been discharged, instead of giving him correct information about his debt or helping him understand the 1099-A Forms. But the Bateses' subjective feeling of coercion is not enough to prove a violation

---

[3] On the Bateses' motion for summary judgment, the bankruptcy court found CitiMortgage liable for violating the discharge injunction by making the insurance call. In his affidavit in support of that motion, Timothy Bates claimed that a CitiMortgage representative "insist[ed]" he was "still responsible under the mortgage to pay for property insurance" and "demand[ed] that [the Bateses] pay for insurance on the foreclosed homestead." At a later hearing to assess the damages caused by the call, it came out that Mr. Bates did not speak to a CitiMortgage representative. Instead, he heard a pre-recorded message explaining that insurance was required under the terms of the mortgage agreement, but CitiMortgage did not have the policy information on file, and requesting that the Bateses "[p]lease provide your insurance carrier and policy information to us." On review of the damages order, the district court noted: "notwithstanding the bankruptcy court's conclusion to the contrary, there is no evidence in this record even remotely suggesting that the call was intended to coerce plaintiffs into paying a discharged debt . . . Indeed, had defendants challenged the bankruptcy court's finding on appeal they may well have obtained a reversal." The Bateses did not appeal the district court's finding, so we need not wade into this bog. Whether or not the call violated the discharge injunction, under these circumstances it adds nothing to their 1099-A claim.

of the discharge injunction, and the Bateses have not presented evidence that the Forms were objectively coercive. In fact, the only evidence in the record shows they were not. And so, we affirm.